# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MASTER-HALCO, INC.,          :
          :
         Plaintiff,     :
          :        No. 3:09cv1546 (MRK)
v.          :
          :
SCILLIA, DOWLING &      :
NATARELLI, LLC, et al.,    :
          :
         Defendants.   :

## RULING AND ORDER

Despite a parade of rulings issued over the last few weeks that have taken the Court and the parties on a tour of the *Federal Rules of Evidence*, a number of issues related to the upcoming trial of this case remain pending. In this order, the Court addresses those matters raised by the Defendants in their Memorandum of Law Regarding Evidentiary Issues [doc. # 121] (hereinafter, "Defs.' Mem."); *see also* Pl.'s Resp. to Defs.' Br. Regarding Evidentiary Issues [doc. # 128] ("Pl.'s Resp."); as well as the issue of whether the Plaintiff, Master-Halco, Inc. ("Master-Halco"), is entitled to a jury charge on restitution. The Court assumes the parties familiarity with the facts and procedural history to date, and refers readers seeking additional background to the Court's prior rulings in this matter. *See, e.g.*, Order dated April 15, 2010 [doc. # 139].

## I.

The first issue raised in Defendants' memorandum is Master-Halco's intended introduction of certain charts, summaries, and/or "pedagogical aids" as trial exhibits. *See* Defs.' Mem. [doc. # 121] at 1-4. Defendants ask that Master-Halco be prevented from presenting "(a) charts summarizing

hearsay or otherwise inadmissible evidence, or (b) pedagogical aids encompassing (i) matters not in evidence, or (ii) inadmissible assertions of its expert witnesses." *Id.* at 1.  In response, Master-Halco says that it has no intention of introducing inadmissible evidence, *see* Pl.'s Resp. [doc. # 128] at 1, but then states that:

> To the extent Plaintiff introduces the underlying facts or data into evidence, the summaries themselves are clearly admissible as full exhibits as a result and, even without doing so, the evidence may clearly be relied upon [by] the experts, and *shown* to the jury, if 'reasonably relied upon by them' in their particular field.

*Id.* at 2 (quoting Fed. R. Evid. 703) (emphasis in original).  Master-Halco's statement is not entirely clear, and therefore the Court is uncertain of the degree of disagreement between the parties. Therefore, for the sake of clarity, the Court will explain the limits of the Rules that lie at the intersection of this issue: Rules 703 and 705, dealing with the testimony of expert witnesses, and Rule 1006, which governs the use of summaries.

> Rule 703 states, in its entirety:
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.  Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.  Thus, by its plain terms, Rule 703 permits experts to base their opinions on inadmissible evidence – for example, hearsay – so long as that evidence is of the type "reasonably relied upon by experts" in that particular field.  *See Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 595 (1993) ("Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the

2

particular field in forming opinions or inferences upon the subject.") (citation and quotation marks omitted); *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993).  However, Rule 703 does *not* generally permit the expert to then relay the inadmissible evidence (as opposed to the expert's opinion) to the jury – at least, as is explained in a moment, on direct examination.  *See* 4-703 *Weinstein's Federal Evidence* § 703.05[2].  Indeed, as the Advisory Committee notes on the 2000 amendments to Rule 703 state, there is "a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert."

There are two general exceptions to this presumption.  First, the Rule permits the introduction of the underlying, otherwise-inadmissible evidence if the Court determines that its "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect."  Fed. R. Evid. 703.  While Master-Halco notes this exception in a footnote and says that "[a] number of the documents at issue . . . would fall precisely within this category," Pl.'s Resp. [doc. # 128] at 1 n.1, it does not substantiate this argument beyond its bare assertion, *see id.* Therefore, the Court does not consider that exception to be at issue here.  *See* 4-703 *Weinstein's Federal Evidence* § 703.05[1] ("[T]o provide further assurance that the opposing party is prejudiced as little as possible by an expert witness's reliance on inadmissible facts or data, the 2000 amendment to Rule 703 prohibits the proponent from disclosing the inadmissible data to the jury unless the court first determines that the probative value of the data to the jury in evaluating the expert witness's opinion substantially outweighs its prejudicial effect.").

The second general exception, which is emphasized in Rule 705, is that the adverse party – here, Defendants – *are* permitted to challenge expert testimony by requiring the expert to disclose

the evidence considered in formulating his or her opinion.  *See* Fed. R. Evid. 705 ("The expert may in any event be required to disclose the underlying facts or data on cross-examination.").  As the Advisory Committee notes again make clear, the proponent of the testimony can then seek to rehabilitate the expert's testimony on rebuttal by eliciting further testimony on the otherwise inadmissible evidence.  *See* Fed. R. Evid. 703 Advisory Comm. notes ("Nothing in this Rule restricts the presentation of underlying expert facts or data when offered by an adverse party.  *See* Rule 705.  Of course, an adversary's attack on an expert's basis will often open the door to a proponent's rebuttal with information that was reasonably relied upon by the expert, even if that information would not have been discloseable initially.").  As a leading evidence treatise puts it, "[O]nce the opponent has 'opened the door' by disclosing inadmissible evidence in cross-examination, the proponent is free to refer to it during redirect examination, even if the trial court initially determined that the proponent could not reveal the inadmissible evidence to the jury during the expert's direct examination."  4-703 *Weinstein's Federal Evidence* § 703.05[2].

These principles notwithstanding, Master-Halco seems to suggest that at least some of the challenged exhibits are admissible under Rule 1006.  That Rule provides, in relevant part, that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.  Master-Halco argues that:

> "An exhibit prepared by an expert as summary evidence is almost never excluded under Rule 1006, since the expert will usually testify that the basis complies with Rule 703.  Experts may rely on facts and data otherwise inadmissible in evidence."  The use of pedagogical devices is "based on the court's authority under Rule 611(a) [of the *Federal Rules of Evidence*] to control the presentation of evidence to make it "effective for the ascertainment of truth," and to avoid "needless consumption of time."

4

Pl.'s Resp. [doc. # 128] at 2 (quoting 6 *Weinstein's Federal Evidence* §1006.08[2]).

Master-Halco over-reads both Rule 1006 and Judge Weinstein's guidance. First, in a passage not cited by Master-Halco, Judge Weinstein's treatise also explains that "[a] chart, summary, or calculation is inadmissible if it is based on inadmissible hearsay" or other inadmissible evidence.[1] *See* 6 *Weinstein's Federal Evidence* §1006.08[2]. Further, when charts or summaries contain assumptions – as Master-Halco's proffered exhibits do – "the assumptions must be supported in the record, either by the testimony of witnesses or by the contents of other admitted trial exhibits." *Id.* Thus, experts may permissibly use summaries that meet the requirements Rule 1006 during their testimony, but only insofar as those summaries do not violate Rule 703. Moreover, while experts may use "pedagogical aids" that meet the requirements of Rule 703, these aids may not be admitted as trial exhibits, as they "are not evidence themselves." 6-1006 *Weinstein's Federal Evidence* § 1006.08[4]; *see also id.* ("It is error to admit as evidence-in-chief a chart or summary that properly can be used only as an aid for the jury's understanding of the evidence.")

With regard to Rule 703, the Second Circuit has been clear in holding that expert testimony may not be used to circumvent otherwise-applicable rules of evidence:

> Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions. . . . *The expert may not, however, simply transmit that hearsay to the jury*. Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [proponent] to circumvent the rules prohibiting

---

[1] Several of Master-Halco's exhibits would fall into this category. For example, Exhibits 62 through 64, for example, which purport to be "summar[ies] of facts" concerning various allegedly-fraudulent deals involving Michael Picard, *see* Pl.'s Ex. List [doc. # 126] at 12-13, are saturated with hearsay. Many of these summaries also appear to summarize oral statements constituting hearsay and/or testimony, which is not permitted under Rule 1006 as it applies only to "writings, recordings, or photographs." Fed. R. Evid. 1006.

hearsay.

*United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations and quotation marks omitted) (emphasis added).  In other words, an expert cannot simply serve as a conduit through which a party can transmit inadmissible evidence to the jury – whether in the form of testimony or a chart.  *See also United States v. Rubi-Gonzalez*, 311 Fed. Appx. 483, 487 (2d Cir. 2009) (summary order) (holding that an expert went beyond the scope of permissible expert testimony under Rule 703 when, *inter alia*, the expert "essentially summarized the results" of a criminal investigation and "transmit[ed] hearsay evidence directly to the jury"); *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993) ("Summary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party."); 4 *Weinstein's Federal Evidence* § 705.03[1] ("[A]n expert witness with *firsthand knowledge* may be asked about the facts underlying his or her opinion because the facts themselves are needed to satisfy the burden of proof.") (emphasis added); *but see id.* § 705.03[2] ("Rule 703 permits an expert to base his or her opinion on inadmissible evidence.  However, this does not constitute a license for the expert to usher hearsay into evidence to prove the truth of the matter contained in the hearsay statement.").

Insofar as Master-Halco believes that it can introduce charts and/or pedagogical aids containing inadmissible evidence, or evidence not yet admitted, through the testimony of its experts, Master-Halco is simply incorrect – unless, as described above, Defendants open the door on cross-examination – regardless of whether the experts relied upon the inadmissible evidence in forming their opinions.  *See Mejia*, 545 F.3d at 197; *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005) ("[I]t is generally viewed as 'improper . . . for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury.' . . . The law already

provides an adequate vehicle for [a plaintiff] to 'help' the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement.") (quoting 6-1006 *Weinstein's Federal Evidence* § 1006.08[4]).

Furthermore, several of the exhibits the parties intend to introduce through the testimony of their experts are independently objectionable because they go beyond the proper scope of expert testimony.[2]   Expert testimony is permitted to help the jury understand facts that are beyond the understanding of lay people. *See* Fed. R. Evid. 702. But in providing this service, even paid experts are not to become proxies for their clients. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (explaining that jurors were not "helped" within the meaning of Rule 701 by opinion testimony that, in addition to telling them "what was in the evidence," also told them "what inferences to draw from it").   Yet some of the exhibits the parties want their experts to utilize stray beyond this narrow role and into what can only be characterized as argument. *See id.* at 749 ("[T]he foundational requirement of Rule 701(b) . . .  is designed to provide assurance[] against the admission of opinions which would merely tell the jury what result to reach.") (quotation marks and citation omitted).   As Judge Learned Hand wisely put it, "Argument is argument whether in the [witness] box or at the bar, and its proper place is the last." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 123 (2d Cir. 1930).   Accordingly, while the parties are free to use argumentative charts and summaries in their closing arguments, it would be improper to introduce argument through charts used by their experts.

---

[2] Plaintiff's Exhibit 70, for example, described as a "chart of summary of Mr. Murray's findings," *see* Pl.'s Ex. List [doc. # 126] at 14, purports to answer virtually every question on which the the Court will charge the jury.  Similarly, Exhibits 108a-h, posters of Mr. Gallo's conclusions, *see id.* at 21, opine on the Defendants "motive" for assisting Mr. Picard in his fraudulent schemes and purports to tell the jury what Defendant Natarelli "likely knew."

In summary, expert witnesses may not testify, or utilize charts, summaries, pedagogical aids, and/or any other kind of demonstrative aid that references evidence not otherwise already admitted *unless* the adverse party opens the door by eliciting testimony on these matters during cross-examination. *See* Fed. R. Evid. 703, 705, 1006. Similarly, experts should not utilize argumentative demonstrative aids – though, of course, the attorneys may do so during their closing arguments. As with the Court's other evidentiary rulings, if the parties stray beyond these limits, the Court will strike the testimony and instruct the jury to disregard it.

## II.

Defendants next seek to preclude Master-Halco from introducing exhibits or expert testimony regarding Atlas's work-in-progress (or "WIP") schedules based on data from June 2003, *see* Defs.' Mem. [doc. # 121] at 5-9, arguing that the underlying data is "patently unreliable," *id.* at 5. Defendants assert that permitting Master-Halco's experts – particularly Mr. Gallo, an accounting expert – to opine on this data would violate the Court's "gatekeeping" role, under which it must ensure that expert testimony relies on sufficiently reliable data and methodologies. *See Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2003) ("[T]he district court has a 'gatekeeping' function under Rule 702 [of the *Federal Rules of Evidence*]—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'") (quoting *Daubert*, 509 U.S. at 597).

The Court previously ruled on aspects of Mr. Gallo's proffered testimony following an evidentiary hearing in which Mr. Gallo testified. *See* Order dated Mar. 25, 2010 [doc. # 99]. As the Court stated during that hearing, many of Defendants' objections to Mr. Gallo's analysis are more appropriately presented on cross-examination. At one of the many pretrial conferences the Court has

held since then, Master-Halco indicated that it intended to call Mr. Gallo as one of its final witnesses, after the WIP schedules were introduced – with an appropriate foundation – through the testimony of one or more of its fact witnesses.

As the Court indicated, if Master-Halco lays a foundation for the WIP schedules, Mr. Gallo will be permitted to testify as to opinions he has drawn from their examination, and Defendants will be able to challenge his opinions and the value, if any, of the WIP schedules on cross-examination. If, on the other hand, Master-Halco has not laid a proper foundation in advance of his testimony, Mr. Gallo will not be permitted to testify as to the WIP schedules.  Therefore, Defendants' motion *in limine* is DENIED, but without prejudice to renewal at trial.

### III.

The Court previously ruled (over Master-Halco's objection) that the Defendants will be permitted to introduce portions of Trial Exhibits 661 through 663, which are the complaint and RICO case statement from a suit Master-Halco filed in 2005 against Michael Picard, and the complaint from a suit it filed against other defendants in April 2006.  *See* Order dated Apr. 1, 2010 [doc. # 114].  Master-Halco now seeks to have the documents admitted in their entirety on the basis of the "rule of completeness" embodied in Rule 106 of the *Federal Rules of Evidence*.  Defendants have objected, arguing that the rule of completeness does not extend to render admissible portions of the documents that are unrelated to the purpose for which Defendants are introducing them.  *See* Defs.' Mem. [doc. # 121] at 9-11.  Master-Halco, for its part, argues that if Defendants wish to introduce the documents, "the very least that the Plaintiff should be afforded is the opportunity to offer evidence which explains and elucidates the information in the context of the entire complaint brought by the Plaintiff."  Pl.'s Resp. [doc. # 128] at 4.

Rule 106 provides, in its entirety as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  Fed. R. Evid. 106.  The Advisory Committee Notes on Rule 106 explain that "[t]he rule is based on two considerations.  The first is the misleading impression created by taking matters out of context.  The second is the inadequacy of repair work when delayed to a point later in the trial."  The Second Circuit has further explained that:

> Under th[e] principle [of the rule of completeness], even though a statement may be hearsay, an "omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."

*United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)).  "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages."  *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999).

As discussed in the Court's prior order, Defendants seek to introduce portions of these documents for the purpose of suggesting that Master-Halco, at least at the time the documents were filed, did not believe that the Defendants were involved in the fraudulent schemes in which Master-Halco has now alleged they participated.  *See* Order dated Apr. 1, 2010 [doc. # 114].  While the Court believes that Master-Halco may be able to identify *portions* of these documents that would help explain further those portions Defendants will introduce, Master-Halco has presented no reason to believe that it is necessary to admit the documents in their entirety  (they total more than 100 pages) merely to fulfill the purposes of the rule of completeness.

10

Therefore, if Master-Halco believes that the portions of the documents identified by the Defendants would be misleading if admitted in isolation, or that other portions are necessary to properly understand the admitted portions, Master-Halco can seek to introduce those portions.  *See Johnson*, 507 F.3d at 796; *Jackson*, 180 F.3d at 73.   Similarly, if instead of introducing the documents as trial exhibits, Defendants seek to read the admitted portions into evidence as an admission of a party opponent, *see* Fed. R. Evid. 801(d)(2), Master-Halco will be permitted to read other portions of the same documents that bear directly on or provide necessary context to the portions the Defendants have read.  However, the Court does not believe that all 100-plus pages of hearsay allegations against non-parties are necessary or relevant to this task, and therefore Defendants' motion *in limine* to preclude the admission of the documents in their entirety is GRANTED.

## IV.

The Court previously deferred ruling on the admissibility of Defendants' Trial Exhibits 533 through 535.  These documents relate to a bankruptcy proceeding in the United States Bankruptcy Court for the Western District of Missouri of Payless Cashways ("Payless"), one of Master-Halco's former customers.  During that proceeding, which was initiated in June 2001, Payless's Chapter 11 Trustee brought a preference action under 11 U.S.C. §§ 547 and 550 against Master-Halco.  The Trustee alleged that within 90 days of filing bankruptcy, Payless, while insolvent, had made payments totaling approximately $110,000 to Master-Halco, putting Master-Halco in a better position than it ought to have been vis-à-vis Payless's other unsecured creditors.  *See* Tr. Ex. 533, Compl. to Recover Avoidable Transfers, *In re Payless Cashways*, No. 02-4273 (W.D. Mo. Bankr. filed Dec. 4, 2002).  One of the proposed trial exhibits is the complaint from that preference action.

11

*See id.*  Another exhibit indicates that Master-Halco later settled the preference claim for $27,000, *see* Tr. Ex. 534, Eighth Omnibus Mot. to Approve Settlement Regarding Preference Actions, *In re Payless Cashways, Inc.*, No. 01-42643 (W.D. Mo. Bankr. filed May 7, 2003) at 2, while the third exhibit states that Payless's creditors ended up receiving less than 20% of their allowed claims, *see* Tr. Ex. 535, Trustee's Mot. to Dismiss Case & Not. of H'ring & Resp. Deadline, *In re Payless Cashways, Inc.*, No. 01-42643 (W.D. Mo. Bankr. filed Feb. 18, 2005) at 1.

Defendants want to introduce these exhibits to rebut the factual assertions underlying Master-Halco's theory of causation.  Master-Halco has alleged that:

> Master-Halco relied on the financial statement prepared by [Defendants] to ship goods [to Atlas].  If [Master-Halco] had known the truth, however, [it] would not have been likely to continue shipping goods and would have moved to bring [its] debt to judgment or sought a prejudgment remedy against Picard and Atlas at an earlier point in time, and/or would have otherwise moved to protect [its] debt, and it is likely that an attachment could have been made at a time before Picard had a chance to make his assets disappear.

Compl. [doc. # 15] ¶ 24.  Defendants have argued, and presumably will argue to the jury, that Master-Halco's delay in taking efforts to collect the Atlas debt had nothing at all to do with any misconceptions about Atlas's financial health.  Defendants say that the evidence will show that Master-Halco made a calculated business decision to defer collection efforts, primarily out of the concern that any such action would push Atlas into bankruptcy, where Master-Halco, as one of many unsecured creditors, would likely receive only a fraction of the approximately $600,000 debt it was owed.  In support of this argument, Defendants want to introduce the Payless documents described above as evidence of events that "strongly influenced" Master-Halco's decision to defer collection efforts against Atlas.  *See* Defs.' Mem. [doc. # 121] at 12.

Master-Halco, for its part, has objected, arguing that the documents are irrelevant and that

their admission would require it "to delve into the details of the *Payless* case, distinguish it from the present litigation, and unduly prejudice the jury from focusing on the parties actions in *this* case." Pl.'s Resp. [doc. # 128] at 4 (emphasis in original).  If the Defendants had nothing beyond mere temporal proximity to suggest that the Payless matter influenced Master-Halco's decision-making process regarding the Atlas debt, the Court would likely agree that the probative value of these exhibits is outweighed by the risk of either confusing the jury and/or causing unfair prejudice.  But Defendants have more than that.

On October 13, 2003, Deborah Fagan, Master-Halco's national credit manager, sent an email to several of Plaintiff's senior managers regarding the options available (or lack thereof) to pressure Mr. Picard into paying the Atlas debt.  The *Payless* preference action – settled approximately 6 months earlier – was explicitly invoked as a cautionary tale:

> There is a very large risk that if we push [Michael Picard] hard, in the situation he is in right now – we are his largest supplier – that he could file Bankruptcy.  We do not have ANY security. . . . The application of funds is real important at this stage of the game.  i.e.: In a bankruptcy scen[a]rio, any application of funds to the oldest balance instead of the COD invoices is subject to [Master-Halco] having to return ALL the extra funds to the Bankruptcy Court (remember Payless . . . ) for the last 90 days prior to their filing. . . .

Tr. Ex. 588 [doc. # 95-1] at 1.  Ms. Fagan also recommended that management get in touch with a particular bankruptcy attorney that "handled Payless" for Master-Halco.  *See id.*

Given Ms. Fagan's express reference to the *Payless* matter as a reason to avoid aggressively pursuing the Atlas debt, the Court finds the evidence that Defendants seek to introduce – court filings that help explain what Ms. Fagan meant when she said "remember Payless" – to be highly relevant to and probative of Defendants' defense.  Master-Halco's theory of Defendants' liability, as discussed above, is entirely premised on a counter-factual scenario that takes as its initial assumption

that Master-Halco would have sued Atlas and/or Mr. Picard immediately if only it had not been misled by the Defendants.  Defendants are entitled to challenge this assumption, and the *Payless* documents are highly relevant to that purpose.

Moreover, while Master-Halco asserts that it would be unfairly prejudiced by the introduction of the *Payless* exhibits, the only explanation it has provided is that they could confuse the jury.  But Defendants are already going to be introducing the email from Ms. Fagan, cited above, and they will undoubtedly bring up Ms. Fagan's parenthetical reference to Payless.[3]  If anything, *excluding* the evidence about the *Payless* matter could confuse the jury, who would otherwise be left to speculate about the significance of Ms. Fagan's reference to Payless.

Therefore, for the reasons explained above, Master-Halco's motion *in limine* to exclude Trial Exhibits 533 through 535 is DENIED.

## V.

The final set of evidentiary issues raised in Defendants' Memorandum [doc. # 121] relate to the Court's prior order denying without prejudice Defendants' motion to exclude evidence related to the allegedly fraudulent acts of others that Master-Halco says were involved in Mr. Picard's conspiracy.  *See* Order dated Mar. 29, 2010 [doc. # 102] at 2-3; *see also* Order dated Apr. 8, 2010 [doc. # 125].  Since Master-Halco will be introducing evidence of at least some of these actions, Defendants seek to prevent Master-Halco from using certain terms and referencing certain facts that they say are unduly prejudicial.  Specifically, Defendants seek to prevent Master-Halco and its witnesses from: (1) characterizing a particular loan as a "loan sharking" transaction and/or a "hard

---

[3] Master-Halco did not object to the admission of Defendants Trial Exhibit 588.  Additionally relevant is the fact that Ms. Fagan no longer works for Master-Halco, currently resides in Texas, and will be testifying only via deposition.

money" loan; (2) referencing the fact that Defendants' counsel is representing the defendants in another suit brought by Master-Halco; and (3) using the terms "badges of fraud" and/or "bustout scheme" in testimony, questions, or exhibits.  *See* Defs.' Mem. [doc. # 121] at 13-15.

The Court first addresses items (1) and (3).  Regarding the first, Master-Halco argues that "there is no inherently prejudicial effect of using the terms 'hard money' or 'loan sharking' that outweigh their probative value."  Pl.'s Resp. [doc. # 128] at 5.  As for item three, Master-Halco argues that "the Plaintiff should be permitted to explain the 'bustout scheme' to the jury in order for the jury to understand the fraudulent scheme that Michael Picard constructed and in which the Defendants participated," and that "[t]hese particular terms . . . are merely descriptive of the facts to which the witnesses will testify, nothing more and nothing less."  *Id.*  The Court disagrees, but only in part.

Master-Halco does not attempt to explain the inherent probative value that it asserts these terms share.  The terms "hard money" and "bustout scheme," in particular, strike the Court as terms of art that will require explanation for a lay jury to understand.[4]  It is difficult to understand how the terms have inherent probative value if the jury will not already know what they mean from their everyday experiences.  By contrast, the jury will certainly have an idea what "loan sharking" means, as that term is loaded with unflattering connotations that may or may not be fairly applied to the transaction(s) in question, depending on the evidence, and Master-Halco has not established at this

---

[4] For example, Black's Law Dictionary defines "hard money" as "1. Coined money, in contrast to paper currency. 2. Cash."  *Black's Law Dictionary* (8th ed. 2004). The Court doubts that Master-Halco intends to use the term as used in the first definition, and if Master-Halco's use is in the vein of the second definition, its meaning can be more easily conveyed without confusion or unfair prejudice by the using the word "cash."

point that using the term is either accurate or necessary.  If the evidence supports the conclusion that

a particular transaction fits the definition of a "loan sharking" arrangement, the jury can easily draw

that conclusion on its own.  The same is largely true of the phrase "badges of fraud."  Master-Halco

has *alleged* that Defendants engaged in fraud; it would be both unfairly prejudicial and an invasion

of the jury's sole responsibility to make that factual determination for itself by having Master-Halco's

experts opine that the actions of Defendants' constituted fraud.  That conclusion is intrinsically tied

to the intent of the actor, which has yet to be adjudicated, and none of Master-Halco's experts have

been qualified as mind readers.  Nor can the Court fathom why fact or expert witnesses need to use

these terms other than to prejudice the jury.

     Accordingly, the Court agrees that the use of these terms in testimony or the elicitation

thereof would be unfairly prejudicial and would invade the province of the jury.  That said, however,

Master-Halco's lawyers will be permitted to use these terms in its closing arguments to convince the

jury what it thinks the evidence has shown.  Therefore, and to this extent, Defendants' motion *in

limine* regarding the use of these terms is GRANTED in part and DENIED in part.

     The Court also GRANTS Defendants' motion *in limine* with regards to the second item, in

which Defendants ask that Master-Halco be prohibited from mentioning that Defendants' counsel

represents the defendants in another suit brought by Master-Halco.  Master-Halco did not address

this issue in its response, and so the Court is not sure whether Master-Halco has any such intention.

However, insofar as Master-Halco does have that intention, it would be improper, as there is no good

reason for Master-Halco to make such references other than to imply that there is a connection

between the actions of the defendants in that other case and the actions of the Defendants here.

While this is what Master-Halco has alleged in its Complaint, this must be proven by competent

evidence, and not innuendo based on one's choice of counsel.  *Cf.* Conn. R. Prof. Conduct 1.2(b) ("A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.").   This conclusion is particularly appropriate in light of the Court's prior order granting Master-Halco's motion to preclude Defendants from referencing the fact that the accounting firm on trial here was previously retained by Master-Halco's counsel.  *See* Order dated Mar. 29, 2010 [doc. # 102] at 2.

## VI.

Also pending is Master-Halco's request to charge the jury that it may award restitution to Master-Halco as a measure of damages.   Master-Halco submitted, as part of the Joint Trial Memorandum, a proposed charge that reads, in relevant part, as follows:

> If you determine that any of the defendants committed a wrongful act or aided and abetted Mr. Picard's wrongful act or acts, then you must determine the dollar amount of Master-Halco's compensatory damages.

> There are two ways you may determine a monetary award in favor of Master-Halco: (1) Damages or (2) Restitution.

> Compensatory damages are those damages that would compensate Master-Halco, and pays it for its losses.  On the other hand, restitution is not aimed at compensating Master-Halco for its loss, but at forcing the defendants to repay benefits they or Atlas unjustly gained. . . .

> [I]f you find it difficult to calculate Master-Halco's loss, you can compensate Master-Halco for the gain received by Atlas, Picard or the defendants, which is called restitution.  In restitution, it is not the defendant's loss that sets the amount of the recovery, but the gain of the defendants or their principal, namely, Atlas. . . .

Pl.'s Request to Charge [doc. # 73-14] at 37.

Defendants initially objected to a jury charge on three grounds: "(i) it was not pled in Plaintiff's Complaint . . . , (ii) it is legally insufficient insofar as it seeks an award of funds not in Defendants' possession, and (iii) it is an equitable claim . . . not properly considered by a jury . . . .".

Defs.' Omnibus Mot. *in Limine* [doc. # 82] at 24.  During one of the pretrial conferences, the Court rejected the first argument, but expressed tentative agreement with the Defendants on the third ground.  However, the Court permitted the parties to file supplemental briefs on the issue, *see* Order dated Mar. 26, 2010 [doc. # 100], which they did, *see* Pl.'s Supplemental Br. [doc. # 129] at 3-5; Defs.' Supplemental Mem. [doc. # 133] at 5-11.

Since Master-Halco is not entitled to a jury trial on claims that sound in equity, *see Periera v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005), the parties' briefs focus primarily on the law/equity distinction.  As this Court has previously observed, the necessity to draw such distinctions presents "real challenges for those of us who have little training, let alone experience, in the subtleties of ancient writs," *Scholastic Corp. v. Kassem & Casper DeToledo LLC*, 389 F. Supp. 2d 402, 403 (D. Conn. 2005), the Supreme Court's assurances notwithstanding, *see id.* (discussing *Great-West Lake & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 217 (2002) ("The dissents greatly exaggerate . . . the difficulty of th[e] task" of determining the types of remedies typically available in equity) (Scalia, J.)).

Before the Court endeavors to determine which side of the law/equity divide Master-Halco's restitution request falls, it notes a more fundamental problem with the proposed jury charge: Master-Halco has not alleged, and does not now claim, that Defendants ever received a benefit from Mr. Picard's allegedly fraudulent schemes.  As the Court has discussed previously, *see* Order [doc. # 139], the unusual aspect of this case is that the Defendants had no direct relationship with Master-Halco.  Instead, Master-Halco alleges that it deferred taking actions to collect a debt owed by one its customer, Atlas Fence, because of Defendants' fraudulent actions in intentionally misrepresenting Atlas's financial health, upon which Master-Halco relied.  *See id.*; Compl. [doc. # 15] ¶ 24.

18

Under the Restatement on Restitution, Master-Halco's allegations would equate to a mistake of fact caused by Defendants' alleged fraud.  *See* Restatement (First) Restitution § 7 (discussing mistakes of fact); *id.* § 8 (defining fraud and misrepresentation); *id.* § 9 (regarding causation). Section 28 of the Restatement on Restitution, entitled "Mistake Due to Fraud or Misrepresentation," provides the following guidance:

> A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution *from the other* if the mistake was induced:
>
> (a) by the fraud of the payee, or
>
> (b) by his innocent and material misrepresentation, or
>
> (c) by the fraud or material misrepresentation of a person purporting to act as the payee's agent, or
>
> (d) by the fraud or material misrepresentation of a third person, provided that the payee has notice of the fraud or representation before he has given or promised something of value.

*Id.* § 28 (emphasis added).  Master-Halco's allegations in this case seemingly fit item into (d), except that it seeks restitution not "from the other" – i.e., Atlas or Mr. Picard – but from the third party that allegedly made the fraudulent misrepresentation – namely, Defendants.

Although Master-Halco analogizes its claim to one of unjust enrichment, *see* Pl.'s Supplemental Br. [doc. # 129] at 3-5, that is an ill fit for its claims against the Defendants, for the simple reason that Defendants were (as Master-Halco concedes) not "enriched."[5]  *See* Restatement

---

[5] In an attempt to understand Master-Halco's restitution argument, the Court questioned its counsel during one of the pretrial conferences whether Master-Halco sought, for example, the fees that Defendants charged Atlas and Mr. Picard for its accounting services, since that could potentially be a "benefit" they received at Master-Halco's expense (albeit quite indirectly).  *See* Restatement (First) Restitution § 1 cmt. b (explaining "[w]hat constitutes a benefit").  Master-Halco's counsel, however, expressly disavowed this as a basis for or measure of restitution.

(First) Restitution § 1 ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."); *see also Schleicher v. Schleicher*, 120 Conn. 528, 534 (1935) ("A right of recovery under th[e] doctrine [of unjust enrichment] is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff."). Master-Halco's claims also cannot be characterized as involving a constructive trust, since Defendants have never possessed what Master-Halco seeks to recover, and Master-Halco has not alleged that there was or is any agency relationship between Defendants and Atlas or Mr. Picard. *See id.* § 167 ("Where the owner of property transfers it to another, being induced by fraud, duress or undue influence of a third person, the *transferee* holds the property upon a constructive trust for the transferor . . . .") (emphasis added).

Although there are circumstances under which a claim of restitution can be asserted against even an innocent third party, *see, e.g.*, *id.* §§ 17, 23, there must at least be the allegation that the third party received some kind of benefit (either directly or indirectly) or otherwise profited at plaintiff's expense. *See Arlington Park Racetrack, Ltd. v. SRM Computers, Inc.*, 674 F. Supp. 986, 990-91 (E.D.N.Y. 1987) ("With few exceptions, unjust enrichment is a prerequisite for enforcement of the doctrine of restitution; and if there is no basis for unjust enrichment, there is no basis for restitution.") (citation omitted). But if the third party did not profit or benefit from the conduct at issue – as Master-Halco concedes in this case – restitution is simply the wrong vehicle for relief. *See* Restatement (Third) of Restitution & Unjust Enrichment pt. II, ch. 5, introductory note (Tentative Draft No. 4, 2005) (explaining that "restitution is concerned only with profitable wrongs," and that, therefore, "[c]ases in which the defendant's wrong results in injury to the claimant but no

benefit to the defendant are not part of the law of restitution").  The Court hastens to add that nothing in this opinion is intended to bar Master-Halco from seeking compensatory damages based on amounts that it lost as a result of conduct of Atlas and/or Mr. Picard that Master-Halco can attribute to Defendants.

Accordingly, at this stage, the Court sees no basis on the merits for charging the jury on restitution (although the Court reserves judgment on whether any restitution claim, even assuming Defendants profited at Master-Halco's expense, would sound in law or equity).  Therefore, Defendants' motion *in limine* to preclude a restitution charge is granted.  If, however, evidence is presented at trial that Master-Halco believes would support a restitution charge, Master-Halco may renew its request.  If it does so, the Court will then go "rattling through dusty attics of ancient writs" to determine whether Master-Halco's claim sounds in law or equity.  *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 575 (1990) (Brennan, J., concurring).

## VII.

In sum, the parties' motions *in limine* are GRANTED in part and DENIED in part.  Expert witnesses will be permitted to use demonstrative aids at trial: (1) that contain evidence previously admitted; and (2) are not argumentative, though the attorneys may use argumentative demonstrative aids during their closing arguments.  Pedagogical aids shall not be admitted as trial exhibits. Similarly, while the attorneys are free to use the phrases "loan shark(ing)," "hard money," "badges of fraud," and "bustout scheme" in their closing arguments (including any demonstrative aids used by the lawyers in their closings),  it would be improper to use those terms in questioning witnesses (fact or expert witnesses), in testimony, or trial exhibits.  Furthermore, at no time may Master-Halco reference the fact that Defendants' attorneys are also representing defendants in other suits brought

by Master-Halco.  So long as Master-Halco lays a proper foundation before Mr. Gallo testifies, he

will be permitted to testify as to the WIP schedules, but Defendants may renew their motion to

exclude that testimony if the foundation has not been properly laid.  Master-Halco's motion to

exclude Trial Exhibits 533 through 535, regarding the *Payless* matter, is denied.  Defendants' motion

to prevent Master-Halco from introducing Trial Exhibits 661 through 663 in their entirety is granted,

but Master-Halco may seek to introduce portions of those documents that bear directly on the

portions introduced by Defendants.  Master-Halco should inform Defendants as soon as possible

what portions, if any, it believes are needed to provide context for the statements Defendants seek to

introduce.  Finally, the Court grants Defendants' motion *in limine* to preclude a jury charge on

restitution, but Master-Halco may renew its request at trial if the evidence shows that such a charge

is warranted.


IT IS SO ORDERED.


/s/  Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut:  April 19, 2010.**